# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

SAVE LONG BEACH ISLAND, a
nonprofit corporation, P.O. Box 579,
Ship Bottom, NJ 08008; ROBERT
STERN, Ph.D., an individual; FRANK
AND NANCY PINO, individuals;
BROOKS GARRISON, an individual;
RICH AND GWYN GABALY,
individuals; DEE WARD, an individual;
and LORI GOLDSCHMIDT AND
CLAY GOLDSCHMIDT, individuals,

                            Plaintiffs,

vs.

ATLANTIC SHORES OFFSHORE
WIND, LLC,

                            Defendant.

Civil Action No. 24-9377-ZNQ-RLS

Hon. Zahid N. Quraishi, U.S.D.J.
Hon. Rukhsanah L. Singh, U.S.M.J.

Return date: March 3, 2025
Oral argument is respectfully requested.

---

**BRIEF IN SUPPORT OF DEFENDANT ATLANTIC SHORES OFFSHORE
WIND, LLC'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO
ORDER PLAINTIFFS TO JOIN NECESSARY PARTIES**

---

Steven T. Senior
Edwin F. Chociey, Jr.
Diane N. Hickey
Michael S. Kettler
**RIKER DANZIG LLP**
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800
Attorneys for Defendant,
Atlantic Shores Offshore Wind, LLC
ssenior@riker.com; echociey@riker.com;
dhickey@riker.com; mkettler@riker.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY .................................2

    A.  The Atlantic Shores Projects ........................................................2

    B.  Multi-year Federal Review and Approval Process .....................................4

    C.  Relevant Municipal Ordinances....................................................8

    D.  Procedural History........................................................................9

LEGAL STANDARD .........................................................................................10

LEGAL ARGUMENT ........................................................................................10

  I.  Federal law preempts Plaintiffs' claims.......................................................10

    A.  Plaintiffs' claims impermissibly conflict with BOEM's authority over offshore wind development on the OCS and its approval of the Projects. .......11

    B.  BOEM's regulation of the physical elements of equipment used for offshore wind energy generation preempts the field of state law claims seeking to control operation of that equipment.............................................................20

  II.  The Complaint fails to state a claim. ........................................................23

    A.  Count I fails to state a claim under State law or local ordinance...............23

    B.  Count II fails to state a claim for private nuisance before any alleged injury or damages have occurred. ...................................................................28

  III.  The Court should order Plaintiffs to join the P1 Entity and the P2 Entity as necessary parties if the Complaint is not dismissed with prejudice in its entirety… ........................................................................................................33

CONCLUSION ...................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Algonquin Gas Transmission, LLC v. Weymouth,*
    919 F.3d 54 (1st Cir. 2019) ...................................................................16, 18, 19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................10

*Baldwin v. Local 843, Int'l Brotherhood of Teamsters,*
    562 F. Supp. 36 (D.N.J. 1982) ................................................................7

*Becker v. Adams,*
    37 N.J. 337 (1962) .............................................................................24

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................10

*Bubis v. Kassin,*
    323 N.J. Super. 601 (App. Div. 1999) .....................................................32

*California v. Federal Energy Regulatory Commission,*
    495 U.S. 490 (1990) ...........................................................................12

*Don Lee Distrib. v. NLRB,*
    145 F.3d 834 (6th Cir. 1998) ..........................................................3, 6, 8

*Erlbaum v. N.J. Dep't of Envtl. Prot.,*
    Civ. Act. No. 16-8198, 2017 U.S. Dist. LEXIS 15595 (D.N.J. Feb. 3, 2017) .....29

*Farina v. Nokia, Inc.,*
    625 F.3d 97 (3d Cir. 2010) .............................................................10, 11

*Geier v. Am. Honda Motor Co.,*
    529 U.S. 861 (2000) ......................................................................10, 12

*Gen. Refractories Co. v. First State Ins. Co.,*
    500 F.3d 306 (3d Cir. 2007) .................................................................34

*In re Vehicle Carrier Servs. Antitrust Litig.*,
   846 F.3d 71 (3d Cir. 2017) ....................................................................11

*Kurns v. R.R. Friction Prods. Corp.*,
   565 U.S. 625 (2012) ........................................................................20, 21

*Liquid Energy Pipeline Ass'n v. FERC*,
   109 F.4th 543 (D.C. Cir. 2024) ............................................................19

*Medco Energi US, L.L.C. v. Sea Robin Pipeline Co., L.L.C.*,
   895 F. Supp. 2d 794 (W.D. La. 2012) ..................................................21

*Murphy v. NCAA*,
   584 U.S. 453 (2018) ..............................................................................11

*Nat'l Fuel Gas Supply Corp. v. Town of Wales*,
   Civ. Act. No. 12-34S, 2013 U.S. Dist. LEXIS 151916
   (W.D.N.Y. Oct. 21, 2013) .....................................................................16

*Oechsle v. Ruhl*,
   140 N.J. Eq. 355 (Ch. 1947) ...........................................................30, 33

*Oneok, Inc. v. Learjet, Inc.*,
   575 U.S. 373 (2015) ........................................................................10, 12

*Priory v. Manasquan*,
   39 N.J. Super. 147 (App. Div. 1956) ...............................................30, 31

*Rose v. Chaikin*,
   187 N.J. Super. 210 (Ch. Div. 1982) ...............................................26, 27

*Samson Energy Res. Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*,
   728 F.3d 314 (3d Cir. 2013) ...................................................................3

*Simmons v. Sabine River Auth.*,
   732 F.3d 469 (5th Cir. 2013) ........................................................*passim*

*South Dakota Mining Ass'n v. Lawrence Cty.*,
   155 F.3d 1005 (8th Cir. 1998) ..................................................12, 13, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ........................................................................................2

*United States v. Louisiana,*
  339 U.S. 699 (1950) ........................................................................................5

*UTI Corp. v. Fireman's Fund Ins. Co.,*
  896 F. Supp. 389 (D.N.J. 1995) ...................................................................33

*Wagner v. Newark,*
  24 N.J. 467 (1957) ........................................................................................24

*Westville v. Whitney Home Builders, Inc.,*
  32 N.J. Super. 538 (Ch. Div. 1954) .............................................................31

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................10, 11

Fed. R. Civ. P. 19 .......................................................................................33, 34

**Constitutions**

N.J. Const. art. IV, § 6, ¶ 2 ..............................................................................25

**Federal Statutes**

16 U.S.C. § 1451 ............................................................................................7, 8

42 U.S.C. § 4321 ..............................................................................................6

42 U.S.C. § 4332 ............................................................................................18

43 U.S.C. § 1331 ..............................................................................................5

43 U.S.C. § 1333 ............................................................................................11

43 U.S.C. § 1334 ............................................................................................15

43 U.S.C. § 1337 ........................................................................5, 11, 18, 22

## State Statutes

N.J.S.A. 13:1G-1 ...............................................................................................23, 26

N.J.S.A. 13:1G-21 ....................................................................................................25

N.J.S.A. 40:55D-1 .....................................................................................................23

N.J.S.A. 40:55D-2 .....................................................................................................25

N.J.S.A. 40:55D-18 ...........................................................................................*passim*

N.J.S.A. 40:55D-62 .............................................................................................25, 27

N.J.S.A. 40:55D-65 .............................................................................................25, 27

N.J.S.A. 48:3-87.1 ......................................................................................................4

## Federal Regulations

30 C.F.R. § 585.100 ...................................................................................................5

30 C.F.R. § 585.422 .................................................................................................15

30 C.F.R. § 585.600 .................................................................................................22

30 C.F.R. § 585.620 ...............................................................................................5, 6

30 C.F.R. § 585.621 .................................................................................................18

30 C.F.R. § 585.626 .................................................................................................22

30 C.F.R. part 585, subpart G ..................................................................................11

77 Fed. Reg. 5560 (Feb. 3, 2012) .............................................................................3

## State Regulations

N.J.A.C. 7:29-1.8(a) .................................................................................................25

## Local Ordinances

Code of the Borough of Beach Haven § 134-11 ....................................................8, 23

Code of the Borough of Beach Haven § 134-5D ......................................................24

Code of the City of Brigantine § 198-127  ....................................................9, 23, 28

Code of the City of Brigantine § 198-2  ..................................................................28

Code of the Township of Long Beach § 123-2  .......................................................24

Code of the Township of Long Beach § 123-5  ...................................................8, 23

## PRELIMINARY STATEMENT

At issue in this matter are proposed offshore wind facilities to be constructed on the Outer Continental Shelf on submerged land owned by the federal government. Over the past decade, Defendant Atlantic Shores Offshore Wind, LLC ("Atlantic Shores LLC") and its related entities have secured the various federal and related state approvals required for such offshore development under federal jurisdiction. With the federal Bureau of Ocean Energy Management at the helm, this permitting regime involved extensive coordination and consultation with other federal agencies, state and local cooperating agencies, and other stakeholders as well as ample opportunity for public comment and participation.

Plaintiffs now ask this Court to undo this federal authorization and to constrain the development of much needed energy generation. Plaintiffs assert claims for nuisance under state law and violations of local ordinances, and seek to enjoin the construction and operation of Atlantic Shores' offshore wind facilities before any of the harms they allege have even occurred. These claims cannot survive a motion to dismiss. Each of Plaintiffs' claims are preempted because they conflict with the federal law governing offshore development within federal jurisdiction. That is, Plaintiffs cannot use state law to prohibit the precise activities on federally-owned submerged land that the federal government has permitted under federal law. In addition, Plaintiffs fail to state a claim upon which relief can be granted. Plaintiffs

1

cannot rely on the cited provisions of state law or local ordinances to prohibit offshore development located beyond the corporate limits of the referenced municipalities and within federal jurisdiction. Plaintiffs' claim for "anticipatory" nuisance fares no better. This Court has held that New Jersey does not recognize a nuisance claim under circumstances such as these when the future activity claimed to be a nuisance has not begun and Plaintiffs concededly have not suffered any alleged injury or damages. For these reasons, this Court should dismiss the Complaint in its entirety.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

**A.    The Atlantic Shores Projects**

Atlantic Shores' offshore wind facilities have been in development for nearly ten years. In 2015, the federal Bureau of Ocean Energy Management ("BOEM") awarded Atlantic Shores a Commercial Lease of Submerged Lands for Renewable Energy Development on the Outer Continental Shelf for Lease Area OCS-A-0499 (this Commercial Lease is referred to herein as the "Lease" and Lease Area OCS-A-0499 is referred to herein as the "Lease Area"). (ROD at 8).[1] The Lease Area covers

---

[1] BOEM Atlantic Shores Offshore Wind South Project Construction and Operations Plan Record of Decision ("ROD") (July 1, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Atlantic%20Shores%20South%20ROD.pdf. In ruling on a motion to dismiss, the Court may consider documents that are incorporated into a complaint by reference and matters of which the Court may take judicial notice. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). The Complaint cites to

a portion of the Outer Continental Shelf ("OCS") within the New Jersey Wind Energy Area ("NJWEA"), which was identified by BOEM as suitable for offshore renewable energy development in 2012 through a multi-year, public environmental review process. (COP Volume I at E-1; see also Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf (OCS) Offshore New Jersey, Delaware, Maryland, and Virginia, 77 Fed. Reg. 5560 (Feb. 3, 2012) (publishing Environmental Assessment of designation of NJWEA for offshore wind leasing)).[2] At its closest point, the Lease Area is located approximately 8.7 miles from the New Jersey shoreline. (COP Volume I at E-2).

   Separate from the federal regulation of offshore development under federal jurisdiction discussed herein, at the State level, New Jersey provides a mechanism for compensation of an offshore wind developer for its project producing renewable

the ROD, see ECF No. 1-1 ¶¶ 1, 6, 95, and the Court may take judicial notice of the content of this publicly available federal agency determination. Don Lee Distrib. v. NLRB, 145 F.3d 834, 841 n.5 (6th Cir. 1998). Excerpts of the ROD are attached as Exhibit A to the Certification of Michael S. Kettler ("Kettler Cert.") submitted herewith.

[2] Atlantic Shores Offshore Wind Construction and Operations Plan ("COP") Lease Area OCS-A 0499: Atlantic Shores South, Volume I: Project Information (May 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Atlantic%20Shores%20South_Volume%20I_Project%20Description_05-01-2024.pdf ("COP Volume I"). The Court may take judicial notice of the contents of this report filed with a federal agency. Samson Energy Res. Co. v. SemCrude, L.P. (In re SemCrude, L.P.), 728 F.3d 314, 326 n.11 (3d Cir. 2013). Excerpts of the COP Volume I is attached as Exhibit B to the Kettler Cert. submitted herewith.

energy. Thus, on June 30, 2021, pursuant to the Offshore Wind Economic Development Act of 2010, specifically N.J.S.A. 48:3-87.1, the New Jersey Board of Public Utilities ("BPU") approved Atlantic Shores' 1,510 megawatt (MW) project to be located within the Lease Area as a qualified offshore wind facility, and awarded to Atlantic Shores an Offshore Renewable Energy Credit ("OREC") allowance. (ROD at 8). Atlantic Shores refers herein to the project that will be developed on the Lease Area under this BPU OREC award as "Project 1." Atlantic Shores contemplates the development of another wind energy generation facility ("Project 2") within the Lease Area in response to future New Jersey OREC solicitations. Project 1 and Project 2 are collectively referred to herein as the "Projects." The Lease was "segregated" in 2022, and the Lease for the portion of the Lease Area on which Project 1 is expected to be constructed was assigned to Atlantic Shores Offshore Wind Project 1, LLC (the "P1 LLC"). (ROD at 1.) The Lease for the portion of the Lease Area on which Project 2 is expected to be constructed was assigned to Atlantic Shores Offshore Wind Project 2, LLC (the "P2 LLC"). (Id.) Atlantic Shores, LLC, the P1 LLC, and the P2 LLC are referred to herein as "Atlantic Shores."

**B.    Multi-year Federal Review and Approval Process**

The United States owns the submerged lands of the OCS that are located greater than three miles from the coastline of the nearest adjacent state; these federally-owned submerged lands include the NJWEA where the Lease Area is

4

located. United States v. Louisiana, 339 U.S. 699, 705-06 (1950). The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, et seq., authorizes the U.S. Department of the Interior to lease federally-owned submerged lands of the OCS for the development of wind energy resources. 43 U.S.C. § 1337(p)(1)(C). BOEM serves as the lead federal agency for offshore wind projects under OCSLA. 30 C.F.R. § 585.100.

In March 25, 2021, Atlantic Shores prepared and submitted a Construction and Operations Plan ("COP") to BOEM, which was reviewed and updated in consultation with BOEM over the course of a nearly three-year review period. (ROD at 3). Submission and BOEM approval of a COP is required before the holder of an OCS lease may conduct offshore wind development activities. 30 C.F.R. § 585.620(c). The COP offers a detailed review of the construction and operation activities, including any potential impacts associated with the Projects and measures to avoid, minimize, and monitor those impacts. (See COP Volume I at E-3). As part of the COP, Atlantic Shores prepared an Onshore Noise Report, which found that "onshore noise from offshore activities will be negligible." (COP, Appendix II-U: Onshore Noise Report at 8-13).[3] The Onshore Noise Report also explained that noise

---

[3] The Onshore Noise Report is available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/2024-05-01_Appendix%20II-U_Onshore%20Noise%20Report.pdf. Excerpts of the Onshore Noise Report are attached as Exhibit C to the Kettler Cert. submitted herewith.

levels from the operation of the wind turbine generators will be audible near the turbines, but will diminish with distance, such that they will not be audible onshore. (Id.)

On September 30, 2021, BOEM issued a Notice of Intent to prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., for its review of the COP. (ROD at 3). BOEM published the availability of the draft EIS for the Project on May 18, 2023. (Id.; Atlantic Shores Offshore Wind South Final Environmental Impact Statement for Commercial Wind Lease OCS-A 0499 (the "FEIS") (May 2024) at ES-1; FEIS, Appendix A, Required Environmental Permits and Consultations).[4] BOEM's review process entailed extensive public involvement, including several public scoping meetings where interested parties were invited to offer feedback and identify issues and potential alternatives for BOEM to consider in the EIS, as well as four additional public meetings during the public comment period on the draft EIS. (FEIS at ES-5; see Appendix A, Required Environmental Permits and Consultations). Plaintiff Save

---

[4]   The FEIS, including its appendices, is available at https://www.boem.gov/renewable-energy/state-activities/atlantic-shores-offshore-wind-south-final-environmental-impact. The Complaint cites to the FEIS, see ECF No. 1-1 ¶ 25, and thus the Court may take judicial notice of the content of this publicly available federal agency determination. See Don Lee Distrib., 145 F.3d at 841 n.5. Excerpts of the FEIS are attached as Exhibit D to the Kettler Cert. submitted herewith. Appendix A of the FEIS is attached as Exhibit E to the Kettler Cert. submitted herewith.

Long Beach Island has alleged in another recently filed complaint that it submitted "extensive comments" to BOEM regarding the draft EIS, including comments about alleged noise from the construction and operation of the Projects. (Complaint, ¶¶ 42-43, Save Long Beach Island, *et al.* v. U.S. Dep't of Commerce, *et al.*, Civ. Act. No. 25-240 (D.N.J. Jan. 10, 2025) (hereinafter, the "Commerce Department Litigation")).[5]

BOEM's review culminated in the publication of the FEIS on May 31, 2024. The FEIS provides a comprehensive overview of all federal authorizations and consultations, covering both offshore and onshore activities, as well as state concurrence authority under the Coastal Zone Management Act, 16 U.S.C. § 1451, et seq., among other state and local authorizations. (FEIS, Appendix A: Required Environmental Permits and Consultations).

The FEIS specifically considered onshore noise impacts from the Projects' construction and operation, and found that "as the Proposed Action would be built 8.7 miles … offshore, noise effects from offshore construction noise would be short term and negligible" and "operational noise from the offshore WTGs would not be

_____

[5] The court may take judicial notice of the content of pleadings in other cases before it. Baldwin v. Local 843, Int'l Brotherhood of Teamsters, 562 F. Supp. 36, 38 & n.1 (D.N.J. 1982) (citing papers on file in different matter, and noting that "[t]he court takes judicial notice of its own records"). The complaint in the Commerce Department Litigation is attached as Exhibit F to the Kettler Cert. submitted herewith.

audible onshore." (FEIS, Appendix F: Assessment of Resources with Moderate (or Lower) Impacts at 3.6.5-10).[6] Further, the FEIS explained that "at a distance of 1,000 feet…, the sound pressure is on the order of 50dBA, a level lower than normal conversation." (Id.)

On July 1, 2024, BOEM issued the ROD, in conjunction with the National Oceanic and Atmospheric Administration, the National Marine Fisheries Service, the U.S. Department of Defense, and the U.S. Army Corps of Engineers. (See generally ROD.) On September 30, 2024, BOEM issued its approval of Atlantic Shores' COP through the issuance of two letters; BOEM issued one letter to the P1 LLC for the construction and operation of Project 1 and the second letter to the P2 LLC for the construction and operation of Project 2.[7]

## C.    Relevant Municipal Ordinances

In their Complaint, Plaintiffs allege violations of certain municipal ordinances. (ECF No. 1-1 ¶¶ 78-80). Plaintiffs cite to § 134-11 of the Beach Haven Code (the "Beach Haven Ordinance") and § 123-5 of the Long Beach Township Code (the "Long Beach Ordinance"), which are local noise control ordinances

---

[6] Excerpts of Appendix F of the FEIS are attached as Exhibit G to the Kettler Cert. submitted herewith.

[7] The Court may take judicial notice of the content of these publicly available federal agency determinations approving the COP. Don Lee Distrib., 145 F.3d at 841 n.5. These letters from BOEM are attached as Exhibits H and I to the Kettler Cert. submitted herewith.

implemented by a municipal governing body to establish standards for permissible sound levels within their respective jurisdictions. (Id. ¶¶ 79-80). Plaintiffs also cite to § 198-127(D)(2) of the City of Brigantine Code (the "Brigantine Ordinance"), which permits wind energy conservation systems in residential and business zone districts within the City limits subject to certain bulk and other requirements, including a maximum noise limitation of 50 decibels measured at the property line. (Id. ¶ 78). These provisions and any additional relevant municipal ordinances at issue are discussed herein at Section II.

### D. Procedural History

On or about September 13, 2024, Plaintiffs filed a Complaint and an application for an Order to Show Cause seeking, among other relief, preliminary and permanent restraints on the Projects' construction and operation, in the Superior Court of New Jersey, Chancery Division, Ocean County. (See ECF No. 1-1). Atlantic Shores removed the Complaint to this Court on September 23, 2024. (See ECF No. 1). On October 16, 2024, by consent order, Plaintiffs withdrew their preliminary injunction application without prejudice. (See ECF No. 12). Atlantic Shores now moves to dismiss the Complaint pursuant to the Court's order waiving the pre-motion conference after the parties had filed pre-motion letters. (See ECF Nos. 13-15).

## **LEGAL STANDARD**

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations and quotations omitted). A plaintiff must provide the grounds for relief, and not just "labels and conclusions." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Further, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (internal citations omitted).

## **LEGAL ARGUMENT**

### I.    **FEDERAL LAW PREEMPTS PLAINTIFFS' CLAIMS.**

Under the U.S. Constitution's Supremacy Clause, "Congress may pre-empt, i.e., invalidate, a state law through federal legislation." Oneok, Inc. v. Learjet, Inc., 575 U.S. 373, 376 (2015) (citing U.S. Const., art. IV, cl. 2). "Federal regulations preempt state laws in the same fashion as congressional statutes." Farina v. Nokia, Inc., 625 F.3d 97, 115 (3d Cir. 2010) (citing Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982)). In addition, when the federal government has acted to preempt state law, state common law claims that are inconsistent with federal law are preempted. Geier v. Am. Honda Motor Co., 529 U.S. 861, 869-72

(2000); see also Farina, 625 F.3d at 115 ("Preemption can apply to all forms of state law, including civil actions based on state law."). Preempted claims may be dismissed on a Rule 12(b)(6) motion to dismiss. In re Vehicle Carrier Servs. Antitrust Litig., 846 F.3d 71, 78, 83-87 (3d Cir. 2017).

There are three types of federal preemption: conflict preemption; field preemption; and express preemption. Murphy v. NCAA, 584 U.S. 453, 477 (2018). As explained below, both conflict preemption and field preemption bar Plaintiffs' claims here. A federal statute, OCSLA, establishes federal ownership and exclusive federal jurisdiction over the Lease Area and other submerged lands of the OCS, and it encourages the development of wind energy resources in this area. 43 U.S.C. §§ 1333(a)(1)(A) (asserting "exclusive Federal jurisdiction" over federally-owned portions of the OCS) & 1337(p)(1)(C) (authorizing leasing program for offshore wind). Likewise, BOEM's regulations establish an extensive federal permitting process under which BOEM has approved the Projects. See 30 C.F.R. part 585, subpart G. As discussed herein, Plaintiffs' claims – which seek to use state law to prohibit the precise activities on federally-owned land that the federal government has permitted under federal law – are preempted. Accordingly, Plaintiffs' Complaint must be dismissed with prejudice in its entirety.

## A.    Plaintiffs' claims impermissibly conflict with BOEM's authority over offshore wind development on the OCS and its approval of the Projects.

State law is superseded under conflict preemption principles when either

"compliance with both state and federal law is impossible or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Oneok, 575 U.S. at 377. Conflict preemption may apply even when the relevant federal statute contains a savings clause. Geier, 529 U.S. at 869 ("the saving clause…does not bar the ordinary working of conflict pre-emption principles") (emphasis in original). Here, Plaintiffs' claims present an obstacle to the federal government's oversight of offshore wind development and accomplishment of OCSLA's authorization of offshore wind activities that BOEM has approved under federal law.

State and local law is subject to conflict preemption when it serves as a "de facto ban" or veto on federally-approved activities on federal land. South Dakota Mining Ass'n v. Lawrence Cty., 155 F.3d 1005, 1011 (8th Cir. 1998); see also California v. Federal Energy Regulatory Commission, 495 U.S. 490, 506 (1990) (preempting state law that would impose more stringent stream flow requirements than federal dam license because state law "would constitute a veto of the project that was approved and licensed by FERC", or Federal Energy Regulatory Commission). In South Dakota Mining Ass'n, Lawrence County, South Dakota enacted an ordinance to ban surface metal mining within certain federally owned land in the Black Hills National Forest. 155 F.3d at 1007. The Federal Mining Act permits exploration for minerals on federal land, including within the Black Hills

12

National Forest, and allows "locators" of mineral deposits to establish an exclusive mining claim. Id. at 1010 (citing 30 U.S.C. §§ 22, 26). Companies and individuals possessed patented mining claims in the area subject to the county ordinance. Id. at 1007. Although the county ordinance on its face did not ban all mining, the Eighth Circuit found that surface metal mining, the particular technique that the ordinance barred, was "the only practical way any of the [owners of mining rights] can actually mine the valuable mineral deposits located on federal land in the area." Id. at 1011. Therefore, the court affirmed the district court's grant of summary judgment permanently enjoining enforcement of the ordinance, explaining that the ordinance:

> completely frustrate[d] the accomplishment of…federally encouraged activities. A local government cannot prohibit a lawful use of the sovereign's land that the superior sovereign itself permits and encourages. To do so offends both the Property Clause and the Supremacy Clause of the federal Constitution.

Id.

Another federal appeals court also has applied the same rule to preclude common law claims, including a nuisance claim, that sought to use state law to prohibit federally-permitted activities. Simmons v. Sabine River Auth., 732 F.3d 469, 477 (5th Cir. 2013). In that case, the Fifth Circuit affirmed the dismissal of state common law claims on preemption grounds, declaring that "[p]ermitting such state property damage claims in an attempt to force changes to a FERC-issued license would constitute a veto of the project that was approved and licensed by FERC." Id.

13

Here, Plaintiffs' Complaint also improperly seeks a de facto ban or veto pursuant to state law over Atlantic Shores' federally-approved Projects. Specifically, the Complaint requests an order permanently enjoining Atlantic Shores from constructing the Projects, <u>unless</u> an elaborate set of studies demonstrates that "noise levels will be underneath 45 dBA at all times…during pile driving (construction) and operations thereafter." (ECF No. 1-1 ¶ 98; <u>see also</u> <u>id.</u> ¶¶ 99-101 (describing requested studies)). Assuming the Complaint's factual allegations to be true, this condition could not be met. That is, Plaintiffs repeatedly allege that noise from the Projects' construction and operation will exceed those levels, thus violating the municipal ordinances and causing "disturbance" and "annoyance," <u>i.e.</u>, a private nuisance. (<u>E.g.</u>, ECF No. 1-1 ¶¶ 10, 16-20, 23-24, 43, 83). Thus, the Complaint does not merely seek to regulate the manner in which federally-permitted activity on federal land will be conducted; rather, it claims that this activity cannot be conducted at all in compliance with state or local law. As Plaintiffs themselves have alleged that applying state and local law would prohibit Atlantic Shores from constructing and operating the federally-approved Projects on the Lease Area, state and local law serves as a de facto ban that conflicts with federal law and is preempted.

Plaintiffs' "alternative" request for an order directing Atlantic Shores to "petition BOEM for use of another area of comparable acreage further offshore" also

must fail. (ECF No. 1-1 ¶ 98).[8] In <u>South Dakota Mining Ass'n</u>, the Eighth Circuit rejected a similar attempt to recharacterize a local law that effectively prohibited an activity as something less than a ban. 155 F.3d at 1009. In that case, the party defending the preempted local law argued that it "only ban[ned] one type of mining, surface metal mining, and [did] so only within a limited area", and so contended that it "[did] not prevent the accomplishment of the purposes and objectives of federal mining law." <u>Id.</u> The Eighth Circuit disagreed, and preempted the local law because, as noted, the banned surface metal mining method was "the only practical way" mining could be performed in the area. <u>Id.</u> at 1011. Here, accepting Plaintiffs' impractical assertion that state or local law should prohibit offshore wind development in an area that the federal government expressly has dedicated for that purpose would similarly frustrate the purpose of federal law.

Further, and even assuming arguendo that the Complaint is not construed as seeking a de facto ban on offshore wind development in the Lease Area, courts also have found conflict preemption when the responsible federal agency's analysis

---

[8] It is doubtful whether the Court possesses the authority to compel Atlantic Shores to abandon the vested rights that it has obtained at great expense in the Lease and in its various state and federal permits for the Projects in the Lease Area, and to start over from the very beginning of the process with a new lease. Essentially, Plaintiffs improperly seek cancellation of the Lease through imposition of local and state laws, which is impermissible under federal law and not defensible given the record supporting BOEM's approval of the COP. 43 U.S.C. § 1334(a)(2)(A)-(B); 30 C.F.R. § 585.422.

considered the same factual issues that the plaintiff attempted to raise under state law and the federal agency nonetheless allowed the challenged activity. For instance, in Algonquin Gas Transmission, LLC v. Weymouth, 919 F.3d 54 (1st Cir. 2019), FERC had approved the plaintiff Algonquin Gas Transmission, LLC's project pursuant to federal law, but the defendant City of Weymouth, Massachusetts denied a permit for one portion of the project under local law. Id. at 63-66. FERC's federal approval and its Environmental Impact Statement "considered essentially the same environmental and safety concerns that the [local] Conservation Commission relied upon in denying Algonquin a Weymouth WPO [Wetlands Protection Ordinance] permit." Id. at 64. Because the local "Conservation Commission's order reach[ed] the opposite conclusion [from FERC] based on essentially the same environmental considerations," the local law "pose[d] a significant obstacle, indeed an effectively complete obstacle, to FERC's ultimate determination" under federal law, which indicated that the project served the public interest and should be constructed. Id. at 65; see also Nat'l Fuel Gas Supply Corp. v. Town of Wales, Civ. Act. No. 12-34S, 2013 U.S. Dist. LEXIS 151916, *9-13 (W.D.N.Y. Oct. 21, 2013) (local permitting authority was preempted to the extent that it attempted to impose more stringent noise requirements than FERC's federal approval).

Likewise, in Simmons v. Sabine River Authority, 732 F.3d 469, 476-77 (5th Cir. 2013), the court found that state common law claims, including nuisance and

negligence, alleging property damage from operation of a FERC-licensed dam in accordance with its license were conflict preempted. When FERC relicensed the Toledo Bend Dam on the Texas-Louisiana state line in 2003, it declined requests to raise the minimum reservoir elevation required under FERC's federal license; FERC found that such raising was unnecessary because the dam "had not had 'any significant effect' on flooding." Id. at 472. Thereafter, the plaintiffs brought their common law claims in Louisiana state court, alleging that opening of the dam's spillway gates in 2009 caused flooding and erosion of their properties. Id. The dam operators had opened the spillway to maintain the reservoir levels required under the dam's FERC license. Id. The Fifth Circuit affirmed the dismissal of these common law claims based on conflict preemption, and refused to countenance the plaintiffs' theory that the dam operators "were negligent because they failed to act in a manner FERC has expressly declined to require." Id. at 476. After the plaintiffs had failed "to impose changes on [d]am operations" through the FERC relicensing proceeding in which FERC had rejected their arguments about flooding, the court rejected the plaintiffs' attempt "to use state law to accomplish the same aims" through a collateral state-law attack on the federally permitted activity. Id. at 477.

Here, Plaintiffs' claims are conflict preempted for the same reasons that the courts in Algonquin and Simmons found preemption. OCSLA directs the Secretary of the Interior, who acts through BOEM, to consider factors including "safety" and

"protection of the environment" in its oversight of offshore wind development activities. 43 U.S.C. § 1337(p)(4)(A)-(B). BOEM's regulations implementing this authority require that a COP for offshore wind development activities in the OCS must demonstrate measures to address safety and avoidance of "undue harm or damage to … life (including human and wildlife) [and] property." 30 C.F.R. § 585.621. In addition, under NEPA, BOEM was required to consider "reasonably foreseeable environmental effects of the proposed agency action" when evaluating the COP. 42 U.S.C. § 4332(C)(i).

In implementing the foregoing authority, BOEM's FEIS expressly found that the construction and operation of the Projects would <u>not</u> result in harmful onshore noise exceeding any of the municipal ordinances on which Plaintiffs rely:

> As the Proposed Action would be built 8.7 miles (14 kilometers) offshore, noise effects from offshore construction noise would be short term and negligible. At a distance of 1,000 feet (305 meters), the sound pressure is on the order of 50 dBA, a level lower than normal conversation (NYSERDA 2013). In this case, operational noise from the offshore WTGs would not be audible onshore.

(FEIS, Appendix F, at 3.6.5-10). As in <u>Algonquin</u>, Plaintiffs here ask this Court to reach under state law the opposite conclusion that BOEM reached under federal law. 919 F.3d at 65. The Complaint itself reveals that Plaintiffs' real quarrel is with Atlantic Shores' COP and BOEM's federal approval of the COP. (ECF No. 1-1 ¶ 6 (faulting Atlantic Shores for allegedly not including other noise analyses in its COP, and alleging that BOEM therefore violated federal regulations)).

Indeed, Plaintiffs Save Long Beach Island and Robert Stern, PhD have filed a separate lawsuit seeking to set aside, under federal law, BOEM's approval of Atlantic Shores' COP and BOEM's Record of Decision approving the FEIS. (Complaint, ¶¶ 53-65, 230-240, 246, Commerce Department Litigation). The complaint in the Commerce Department Litigation specifically attacks BOEM's conclusions about the onshore impacts of noise from the Projects – the same subject matter as the state law claims in this lawsuit. (Id. ¶ 43 ("The DEIS fails to analyze the effect of the project's airborne construction and operational noise at sensitive receptors onshore.") & ¶ 64 ("The final EIS failed to provide impact information essential to make any reasoned decision on project approval or disapproval, including that from…airborne noise from pile driving and turbine operation")).[9]

In this lawsuit, Plaintiffs cannot "use state law to accomplish the same aims" that they simultaneously are pursuing in the Commerce Department Litigation challenging BOEM's decisions under federal law. See Simmons, 732 F.3d at 477.

---

[9] The Memorandum concerning wind energy recently issued by President Trump on January 20, 2025 (the "Memorandum") does not affect Atlantic Shores' vested rights in its existing Lease or its federal approvals and has no effect on the preemptive force of the federal statutes and regulations relied on by Atlantic Shores herein. The Memorandum does not change the provisions of OCSLA, which would require an act of Congress, or BOEM's regulations, which would require notice and comment rulemaking. Liquid Energy Pipeline Ass'n v. FERC, 109 F.4th 543, 547 (D.C. Cir. 2024) ("[O]nce an agency makes a rule … the APA requires the agency to provide notice and an opportunity for comment before repealing or amending it.") (citation omitted).

Through the operation of conflict preemption, the Supremacy Clause prohibits any

plaintiffs, including Plaintiffs here, from a second bite at the apple under state or

local law when they disagree with the federal government's conclusions under

federal law. The proper, and only, vehicle for litigation involving Plaintiffs' factual

allegations about noise from the Projects is the Commerce Department Litigation,

and this parallel proceeding under state law is preempted.[10]

**B.    BOEM's regulation of the physical elements of equipment used for offshore wind energy generation preempts the field of state law claims seeking to control operation of that equipment.**

The Supreme Court has applied field preemption when federal law regulates

the same "physical elements" sought to be controlled under state law. Kurns v. R.R.

Friction Prods. Corp., 565 U.S. 625 (2012). In Kurns, the plaintiffs asserted state law

tort claims arising from occupational exposure to asbestos contained in locomotive

brakeshoes and boilers. Id. at 628-29. A federal statute, the Locomotive Inspection

Act (the "LIA"), provides that a "locomotive or tender and its parts and

appurtenances" may be used on a railroad line only if, among other things, they are

"in proper condition and safe to operate without unnecessary danger of personal

injury" and they "have been inspected as required under [the statute] and regulations

prescribed by the Secretary of Transportation." Id. at 629-30 (citing 49 U.S.C. §

---

[10] For the avoidance of doubt, Atlantic Shores does not concede that any claims in the Commerce Department Litigation are substantively or procedurally meritorious.

20701).

The <u>Kurns</u> Court held that the LIA preempted the field of regulation of locomotives, tenders, and their parts and appurtenances due to the "general" power delegated to the federal agency over "the design, the construction and the material" of this equipment. <u>Id.</u> at 631 (citing <u>Napier v. Atl. Coast Line R. Co.</u>, 272 U.S. 605, 611, 613 (1926)). The Supreme Court instructed that "the scope of the preempted field" is determined by "<u>the physical elements affected</u> by [the relevant state law,]" not by "the object sought through [the relevant state law]." <u>Id.</u> at 631-32 (citing <u>Napier</u>, 272 U.S. at 612) (emphasis added). The Court also ruled that the field preemption of claims relating to the regulated locomotive equipment extended to the state common law tort claims that the plaintiffs had asserted because "the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." <u>Id.</u> at 637 (citations omitted).

In a different context, a federal district court, following <u>Kurns</u>, preempted state common law tort claims for business damages arising from the curtailment of gas from a pipeline subject to FERC regulation under the Natural Gas Act. <u>See</u> <u>Medco Energi US, L.L.C. v. Sea Robin Pipeline Co., L.L.C.</u>, 895 F. Supp. 2d 794, 810 (W.D. La. 2012). There, the court explained that the state law claims were preempted because they "operate[d] upon the same <u>physical elements</u> as the NGA – <u>i.e.</u>, the transmission of gas by a pipeline company." <u>Id.</u> (emphasis in original).

Here, as noted, OCSLA empowers BOEM to regulate offshore wind development activities undertaken by holders of OCS leases. See 43 U.S.C. § 1337(p)(4). No OCS leaseholder can construct wind energy generation facilities until BOEM approves its COP. See 30 C.F.R. § 585.600(a)(2). Under BOEM's regulations, the COP must include project-specific information regarding "[g]eneral structural and project design, fabrication, and installation," including "[p]reliminary design information for each facility associated with your project." 30 C.F.R. § 585.626(a)(5). Accordingly, Atlantic Shores' COP described the dimensions and specifications of the WTGs that would be installed to complete the Offshore Projects based on "the maximum dimensions of WTGs anticipated to be commercially available within the Projects' expected development schedule." (COP Volume I at 4-22 to 4-23). BOEM approved Atlantic Shores' COP. (Kettler Cert., Exhs. H & I.) As in Kurns, federal law mandates that a holder of an OCS lease cannot use certain equipment when undertaking activities on that lease until a federal agency has approved that equipment. Thus, federal law preempts Plaintiffs' Complaint that seeks to regulate – in fact, to prohibit – the operation of these physical elements of Atlantic Shores' equipment that BOEM has approved under federal law.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM.

### A.    Count I fails to state a claim under State law or local ordinance.

Even if not preempted, the Complaint's Count I for alleged violation of the Brigantine, Beach Haven and Long Beach Ordinances must be dismissed because Plaintiffs fail to state a cause of action under State law or local ordinance. As a threshold matter, Plaintiffs cannot rely on provisions of local ordinances to regulate the Projects located beyond each municipalities' respective boundaries within federal jurisdiction on the OCS.

Plaintiffs also fail to assert a cause of action under the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-1, et seq., or any local ordinance adopted pursuant thereto. In the Complaint (ECF No. 1-1 ¶¶ 78-80), Plaintiffs rely on the enforcement provision of the MLUL, N.J.S.A. 40:55D-18, to seek to enforce future alleged violations of certain local ordinances, including the Brigantine Ordinance (§ 198-127(D)(2)), Beach Haven Ordinance (§ 134-11) and Long Beach Ordinance (§ 123-5). Though the Brigantine Ordinance is a municipal zoning ordinance adopted pursuant to the MLUL, the Beach Haven and Long Beach Ordinances are municipal noise control ordinances adopted pursuant to the Noise Control Act of 1971 (the "Noise Control Act"), N.J.S.A. 13:1G-1, et seq. Compare Brigantine Code Chapter 198 entitled "Land Use" with Beach Haven Code § 134-5D (recognizing that the Beach Haven Ordinance and related noise control provisions are intended to

23

implement the Noise Control Act and New Jersey Department of Environmental Protection ("NJDEP") model noise control ordinance) <u>and</u> Long Beach Code § 123-2 (referring to the Long Beach Ordinance and related noise control provisions as part of the "model noise chapter").

This is a critical distinction. It reveals a fundamental, fatal flaw in Plaintiffs' Complaint.

As shown below, Plaintiffs cannot rely on the enforcement provision of the MLUL, N.J.S.A. 40:55D-18, to seek to enforce the Beach Haven and Long Beach Ordinances. Further, Plaintiffs cannot rely on N.J.S.A. 40:55D-18 to seek to enforce the Brigantine Ordinance against the Projects located within federal jurisdiction on the OCS. For these reasons, and as further explained below, Plaintiffs fail to state a cognizable claim to enforce these ordinances under the MLUL, N.J.S.A. 40:55D-18.

**1.    N.J.S.A. 40:55D-18 does not provide a basis for relief for alleged violations of the Beach Haven or Long Beach Ordinances.**

It is well established that a municipality is a creature of the State. <u>See</u> <u>Becker v. Adams</u>, 37 N.J. 337, 340 (1962); <u>Wagner v. Newark</u>, 24 N.J. 467, 474 (1957). Accordingly, a municipality only possesses those powers delegated to it by the Legislature. <u>Id.</u>

The New Jersey Constitution specifically authorizes the Legislature to delegate zoning power to municipalities. N.J. Const. art. IV, § 6, ¶ 2. The purpose of the MLUL, the enabling legislation for municipal land use and zoning regulation, is

to "encourage municipal action to guide the appropriate use or development of all lands within the State, in a manner that will promote the health, safety, morals and general welfare." N.J.S.A. 40:55D-2(a). In furtherance of this goal, the MLUL grants to municipal governing bodies the power to adopt or amend a zoning ordinance, effectively allowing them to regulate land use within municipal boundaries. See N.J.S.A. 40:55D-62 (granting a municipal governing body the power to zone) & -65 (setting forth the permissible scope and contents of municipal zoning ordinances).

Separate from the MLUL, the Noise Control Act is the enabling legislation for NJDEP regulation of noise control. It also is the enabling legislation for a municipal governing body to adopt a municipal noise ordinance. See N.J.S.A. 13:1G-21; N.J.A.C. 7:29-1.8(a). [11]

As noted, Plaintiffs rely on the MLUL's enforcement provision, N.J.S.A. 40:55D-18, to seek to enforce certain local ordinances. (ECF No. 1-1 ¶ 84). Although enforcement is generally within the municipal governing body's purview, N.J.S.A. 40:55D-18 affords an interested party the right to "institute any appropriate action

---

[11] NJDEP has adopted a Model Noise Control Ordinance as guidance for municipalities to follow when adopting a noise control ordinance pursuant to the Noise Control Act. All such municipal ordinances must be submitted for written approval to the NJDEP. N.J.A.C. 7:29-1.8(a). The Model Noise Control Ordinance is on NJDEP's website (March 13, 2024) available at https://www.nj.gov/dep/ enforcement/noise-intro.html. The Beach Haven and Long Beach Ordinances are identified as NJDEP approved municipal noise ordinances. See https://www.nj.gov/ dep/enforcement/masterlist2.pdf.

or proceedings" when "any building or structure is erected, constructed, altered, repaired, converted, or maintained, or any building, structure or land is used <u>in violation of [the MLUL] or of any ordinance or other regulation made under authority conferred hereby</u>." (emphasis added). It does not, however, provide an enforcement mechanism for ordinances adopted pursuant to the Noise Control Act or other statutory schemes.[12] As the Beach Haven and Long Beach Ordinances are noise control ordinances adopted pursuant to the Noise Control Act, and are not zoning ordinances adopted pursuant to the MLUL, Plaintiffs cannot seek to enforce those ordinances under the MLUL, N.J.S.A. 40:55D-18.

Plaintiffs concede this point. They acknowledge in the Complaint that "N.J.S.A. 40:55D-18, affords any 'interested party' the right to secure an injunction against a <u>zoning ordinance</u> violation." (ECF No. 1-1 ¶ 77) (emphasis added).

Further, they refer in the Complaint to <u>Rose v. Chaikin</u>, 187 N.J. Super. 210, 221 (Ch. Div. 1982), in alleging that "[s]ince Brigantine's Ordinance 11-1981 sets noise standards for windmills and is part of the city <u>zoning ordinance</u>, its violation is subject to restraint under the statute." (ECF No. 1-1 ¶ 82) (emphasis added). Their reliance on <u>Rose</u> is misplaced.

---

[12] Further, to the extent that Plaintiffs seek to allege a violation of the Noise Control Act or any local ordinances adopted pursuant thereto, the Noise Control Act does not provide Plaintiffs with a private right of action. <u>See</u> N.J.S.A. 13:1G-1, <u>et</u> <u>seq.</u>

In <u>Rose</u>, the plaintiffs occupied the neighboring property to the defendant's privately owned windmill and sought to enjoin the windmill's operation, alleging that it constituted both a private nuisance and a violation of local zoning laws. <u>Id.</u> at 213. The <u>Rose</u> court granted injunctive relief, <u>i.e.</u>, enjoining the windmill's operation, on nuisance grounds and recognized defendant's violation of the zoning ordinance as an alternative basis for such relief.  <u>Id.</u> at 223. Here, unlike in <u>Rose</u>, the Beach Haven and Long Beach Ordinances are not zoning ordinances adopted pursuant to the MLUL, and thus N.J.S.A. 40:55D-18 cannot provide any basis for any relief sought by Plaintiffs. In addition, as shown in Section II.B. below, Plaintiffs here, unlike in <u>Rose</u>, cannot state a claim for nuisance either.

## 2.    The Brigantine Ordinance does not apply to the Projects to be located on federally-owned submerged land of the OCS.

As noted, a municipal governing body's power to zone flows from the legislative delegation effectuated through the MLUL. Under the MLUL, a municipal governing body may create zoning districts within the municipal boundaries, and permit certain uses and establish zoning standards governing development within those districts. <u>See</u> N.J.S.A. 40:55D-62 & -65.

Though the Brigantine Ordinance is a zoning ordinance adopted pursuant to the MLUL, it operates only within Brigantine's municipal limits.[13] See N.J.S.A. 40:55D-62; Brigantine Code § 198-2 (stating that the purpose of Brigantine's land use ordinance is to, among other things, "[g]uide the use and development of all the lands of the City of Brigantine in the appropriate manner that will promote the health, safety and welfare of the general public") (emphasis added); Brigantine Code § 198-127 (permitting wind energy conservation systems in any residential and business zone districts established within City limits). Unlike in Rose, which applied the local zoning ordinance to defendant's onshore windmill located within City limits, the Brigantine Ordinance simply does not apply to the Projects to be constructed on the OCS on federally-owned submerged lands pursuant to OCSLA and other federal laws. Accordingly, Plaintiffs cannot rely on N.J.S.A. 40:55D-18 to attempt to enforce the Brigantine Ordinance against the Projects.

**B.     Count II fails to state a claim for private nuisance before any alleged injury or damages have occurred.**

Plaintiffs cannot maintain a cause of action for "anticipatory" nuisance in the Complaint's Count II. (See ECF No. 1-1 ¶¶ 93-94 (citing cases decided under Kansas and Nevada law in support of "anticipatory nuisance" theory)). This Court has held

---

[13] The Brigantine Ordinance purports to regulate "wind energy conservation systems" and imposes a 50 decibel noise limitation on such wind energy conservation systems.

that New Jersey does not recognize a nuisance claim when the activity alleged to be a nuisance has not begun and the plaintiff has not suffered damages. See Erlbaum v. N.J. Dep't of Envtl. Prot., Civ. Act. No. 16-8198, 2017 U.S. Dist. LEXIS 15595, at *29-30 (D.N.J. Feb. 3, 2017).

Erlbaum concerned a Congressionally-authorized and long-planned project designed to provide shore protection for the municipalities of Absecon Island, including Margate. Id. at *3. The project was comprised of a dune and berm system along the beach. Id. The plaintiffs, beachfront property owners, asserted a claim for public nuisance as to the State entities participating in the project and sought to enjoin the project's construction based on drainage and other concerns. Id. This Court declined to issue an injunction to prospectively abate the alleged nuisance, reasoning that "it is undisputed that no part of the [p]roject has yet been built in Margate and that no harm has yet come to the Plaintiffs as a result of any project construction, [so] Plaintiffs have not suffered any damages and cannot maintain this action under state law." Id. at *30.

Similarly, Plaintiffs cannot maintain a cause of action for anticipatory private nuisance under New Jersey law based on the alleged future impacts of the Projects. The Projects are federally authorized and received State approvals to construct and operate an offshore wind turbine project. In addition, as Atlantic Shores has not

started to construct the Projects, Plaintiffs have not suffered any alleged harm from noise, infrasound, visual, or other impacts of the Projects.

The New Jersey Appellate Division has also declined to enjoin construction of a project that allegedly would cause a nuisance when completed because the project did not constitute a "nuisance per se." See Priory v. Manasquan, 39 N.J. Super. 147, 157 (App. Div. 1956). In Priory, the plaintiff beachfront property owners sought to enjoin construction of a comfort station adjacent to the boardwalk. Id. at 147. The trial court issued an injunction barring construction of the comfort station. Id. at 155. On appeal, the Appellate Division overturned the injunction, recognizing that a State statute expressly authorized municipalities to erect comfort stations and finding that the comfort station did not constitute a nuisance per se. Id. at 157.

The Appellate Division explained that a nuisance per se is a "structure which is a nuisance at all times and under all circumstances, regardless of location or surroundings." Id. Importantly, the Appellate Division confirmed that "[a]n injunction should not issue on the basis of mere apprehension," and a party does not have standing until the business is erected and "proved to be a nuisance." Id. at 157-58. The fact that a statute permits and encourages an activity is strong evidence that it is not a nuisance per se. Id. at 157 ("In fact, R.S. 40:48-4 expressly authorizes municipalities to erect comfort stations."); see also Oechsle v. Ruhl, 140 N.J. Eq. 355, 364 (Ch. 1947) (declining to enjoin construction of airport, observing that "[t]he

30

legislative grant of authority to the State Aviation Commission to issue licenses …
is a recognition of the construction, operation and conduct of an airport as a legal
business").

Here, Plaintiffs do not and cannot argue that the Projects, or offshore wind
development generally, constitute a nuisance per se. As with the comfort station in
Priory, the Projects are expressly authorized by law, in this case pursuant to a
complex federal and state regulatory scheme involving a multi-year permitting
process. It cannot be said that they constitute "a nuisance at all times and under all
circumstances, regardless of location or surroundings." Priory, 39 N.J. Super. at 157.
Indeed, Plaintiffs argue as an alternative request for relief that the Projects should be
built in a new lease area further offshore. (ECF No. 1-1 ¶ 98).[14]

In addition, although the Complaint primarily seeks an injunction preventing
the Projects from ever being constructed because of alleged harms arising from
noise, Plaintiffs also seek alternative relief in the form of "a fund of sufficient size
to compensate all Plaintiffs for their respective property value diminution." (ECF

---

[14] The Priory decision, which held that only a nuisance per se can be prospectively
enjoined, represents the Appellate Division's controlling precedent on this issue.  To
the extent other cases, including Westville v. Whitney Home Builders, Inc., 32 N.J.
Super. 538 (Ch. Div. 1954), suggest a different conclusion, Priory controls.  Further,
although it did not specifically use the term nuisance per se, Westville is in fact
consistent with Priory in that the court in Westville implicitly found that the sewage
disposal plant at issue in that case was a nuisance per se, as it relied on a statute that
prohibited the construction of sewage disposal plants without approval of a state
commission. Id. at 544.

No. 1-1 ¶ 102). The "property value loss estimates" on which Plaintiffs rely to demand a fund of $6,000,000 are based solely on speculation regarding the feared visual impacts of the Projects. (See, e.g., ECF No. 1-1 ¶¶ 67-74; 90-92, 102). Plaintiffs are not entitled to this relief, as it is well-established that impacts to views from one's property do not give rise to a nuisance claim. See Bubis v. Kassin, 323 N.J. Super. 601, 616 (App. Div. 1999) (affirming dismissal of claim that constructing "a sand berm … which obstructs plaintiffs' view of the ocean" constitutes nuisance because "in the absence of a restrictive covenant, a property owner has no right to an unobstructed view across a neighbor's property").

***

In sum, the Projects have undergone a nearly decade long federal and state regulatory approval process that considered and dismissed the asserted impacts on which Plaintiffs rely in support of their state law claim for anticipatory nuisance that attempts an end run around the well-established federal permitting scheme. Importantly, in the event that Plaintiffs' apprehensions regarding the Projects are borne out after the Projects are built, Plaintiffs would not be foreclosed from asserting a private nuisance claim, assuming arguendo that it was not preempted. Plaintiffs essentially claim that the ocean is their figurative backyard and that no new source of energy could be developed several miles away from their properties. Yet New Jersey courts have wisely declined to foreclose the development of innovative

nascent industries by enjoining them before they might even begin operations as Plaintiffs seek to do here. As the former Court of Chancery noted when it declined to block construction of an airport in the 1940's, the new airport's opponents "advanced [an argument] comparable to that advanced while steam railroads were in their infancy." <u>Oechsle</u>, 140 N.J. Eq. at 364. If a new "business was restrained in the first instance, we could never learn from the great teacher experience, whether the business would, in fact, be a nuisance or not." <u>Id.</u> (citation omitted). Plaintiffs' anticipatory nuisance claim fails under New Jersey law.

## III.  THE COURT SHOULD ORDER PLAINTIFFS TO JOIN THE P1 ENTITY AND THE P2 ENTITY AS NECESSARY PARTIES IF THE COMPLAINT IS NOT DISMISSED WITH PREJUDICE IN ITS ENTIRETY.

Plaintiffs failed to join the P1 LLC and P2 LLC as necessary parties in this action. Under Fed. R. Civ. P. 19(a)(1), parties are considered "necessary" if the Court cannot accord complete relief among existing parties in their absence or the absent party's interest in the subject of the action may be impaired or impeded if the action is disposed of in their absence. <u>See also</u> <u>UTI Corp. v. Fireman's Fund Ins. Co.</u>, 896 F. Supp. 389, 392 (D.N.J. 1995).

Here, the P1 LLC and the P2 LLC are the entities that hold the interest in the Lease and actually will be conducting the construction activities and operating the wind turbines that will cause the harm alleged in the Complaint. (<u>See</u> Kettler Cert., Exhs. H & I (COP approval issued to the P1 LLC and the P2 LLC); ROD at 1

(describing Atlantic Shores, LLC's assignment of the Lease to the P1 LLC and the P2 LLC)). The P1 LLC and P2 LLC are necessary parties because in their absence, this Court cannot accord complete relief among the existing parties. Fed. R. Civ. P. 19(a)(1)(A). Importantly, if Plaintiffs were to succeed in this action, this Court's judgment would not bind the P1 LLC or the P2 LLC.

Under Rule 19(a), the joinder of necessary parties is compulsory if their joinder is "feasible." Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306, 312 (3d Cir. 2007); Fed. R. Civ. P. 19(a)(2). Joinder of the P1 LLC and P2 LLC is feasible as it will not divest this Court of subject matter jurisdiction. Accordingly, Atlantic Shores requests, as alternative relief and only in the event that both counts of the Complaint are not dismissed with prejudice, that the Court direct Plaintiffs to join the P1 LLC and the P2 LLC as defendants.[15]

---

[15] Further, in the event the P1 LLC and the P2 LLC are joined as defendants, Atlantic Shores LLC should be dropped as a defendant because, as noted, Atlantic Shores LLC does not hold the Lease and is not the party that will be constructing and operating the Projects.

## **CONCLUSION**

For the foregoing reasons, Atlantic Shores respectfully requests that the Court

dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

RIKER DANZIG LLP
Attorneys for Defendant
Atlantic Shores Offshore Wind, LLC

By: _____ *s/ Steven T. Senior* _____
Steven T. Senior

Dated: January 27, 2025

4924-0389-2481, v. 19